## (April 14, 1977)

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN L. MURDICK, JR., Appellant.—Appeal from a judgment of the County Court of Albany County, rendered January 29, 1975, upon a verdict convicting defendant of the crimes of petit larceny (two counts) and official misconduct (two counts). The defendant, formerly a police patrolman with the City of Albany, was indicted for the crimes of falsifying business records in the first degree; petit larceny; and official misconduct, all relating to the allegations in separate indictments that on August 21, 1972 he stole 77 dimes from parking meters on State Street and that on October 16, 1972 he stole 29 dimes. Prior to trial the charges of falsifying business records were dismissed and the trial was held on the remaining charges relating to the separate alleged thefts. Two members of the New York State Police (Bureau of Criminal Investigation) testified that as part of an investigation initiated by the State Investigation Commission they undertook to determine if policemen assigned to collect the money from parking meters were stealing any of such moneys. In furtherance thereof, certain dimes were marked with fluorescent dyes which would not ordinarily be observed by simple inspection, but would glow under the influence of ultraviolet light. On August 21, 1972 four dimes with red markings were placed by them in 25 separate meters on State Street for a total of 100 dimes or $10. On October 16, 1972 the same procedure was followed except that the dimes were marked with a yellow dye which the record indicates was inferior in its lasting qualities to the red dye. It should be noted that the evidence established that all of the coins so marked by dyes glowed before being taken by the investigators to be put in the meters and the evidence is such as to establish that upon insertion in the meters and following handling up until the proceeds of meter collections were taken to the bank for deposit and following handling at the bank they would have continued to glow under ultraviolet light. On both dates the investigators kept a surveillance on the meters after their deposit of dimes and they observed the defendant

collecting the proceeds from the meters. Investigator Probst described the movements of defendant as follows: "With his right hand, he would take the key, insert it in the parking meter receptacle, unlock it and open it up. As it was opened up, he would reach with his left hand and empty the parking meters", and also "he [defendant] would scoop it out with his left hand and his left hand would come away, and after he made a motion toward the receptacle, his left hand would remain clenched, closed", and further "some of the parking meters, he would scoop the money into the cash receptacle, and other meters, when his left hand went into the receptacle [meter], he took his hand out, his fist was closed, and then just before would go to the next parking meter, he would place his left hand in his left hip trouser pocket." Investigator McCart testified to the effect that the defendant at each meter would reach "in with his left hand and, you know, scrape the dimes out", but that on some occasions his left hand came away closed and he would thereafter put his closed hand in his left trouser pocket." Both investigators testified that they observed a bulge in the left trouser pocket at the end of the collections which they had not observed at the beginning of the procedure. On both days the investigators followed the defendant to the bank with the money bag and observed him handing it to the bank employees and immediately thereafter they inspected the bag (without defendant's knowledge) and discovered on August 21 that only 23 of the dimes deposited would glow red and on October 16 that only 71 of the deposited dimes would glow yellow. Both investigators testified unequivocally that they at no time observed any dimes in the defendant's hand. They further testified to the effect that they did not know what the interior condition of the meters was on the days in question, but that they did know that their dimes entered the interior of the meters because they heard a noise or clink when they turned the meter handle upon insertion indicating that the coins dropped. It appears that the defendant was not apprehended by the investigators on the days in question before he left their sight and that the meters were not opened and inspected to be sure they were empty because it was an ongoing investigation and the investigative authority did not want the Albany Police Department to be aware of the investigation. The dispositive issue upon this appeal is whether or not the People have proven beyond a reasonable doubt by circumstantial evidence that there was a theft of dimes on August 21 and/or October 16, 1972. Taking the People's case as substantially set forth hereinabove and applying the presumption that the defendant in carrying out his collection duty would collect and deposit all of the dimes found in the assigned meters on the days in question, there can be no doubt that the evidence is adequate and sufficient. The tests to be applied to the People's evidence were recently expressed in the case of *People v Benzinger* (36 NY2d 29, 32) as follows: "The oft-stated rule with respect to convictions based exclusively upon circumstantial evidence is that for guilt to be proven beyond a reasonable doubt the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved must exclude 'to a moral certainty' every reasonable hypothesis of innocence. (E.g., *People v. Borrero,* 26 N Y 2d 430, 434–435; *People v. Cleague,* 22 N Y 2d 363, 365–366.) The reason for the current application of this rule is not that circumstantial evidence is thought to be weaker than direct evidence, since the reverse is frequently true. Rather, the rule draws attention to the fact that proof by circumstantial evidence may require careful reasoning by the trier of facts. By highlighting this aspect, the rule hopefully forecloses a danger legitimately associated with circumstantial evidence—that the trier of facts may

leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree (see *People v. Cleague, supra,* at p. 367). In the end, the application of the test becomes 'a question whether common human experience would lead a reasonable man, putting his mind to it, to reject or accept the inferences asserted for the established facts.' *(People v. Borrero, supra,* at p. 435; *People v. Wachowicz,* 22 N Y 2d 369, 372.) Since the issue is the sufficiency of the circumstantial evidence, we view the facts most favorable to the People *(People v. Cleague, supra,* at p. 366; see *Noto v. United States,* 367 U. S. 290, 296). We assume that the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it." However, while a given set of facts would lead to a conclusion with such certainty that the conclusion is "proven", the instant case did not end with the People's presentation of the above evidence. The defendant established by unrebutted evidence that not all of the meters worked properly and that while one might open a meter and have coins fall into a bag or be immediately accessible, other meters would have defective interiors whereby coins would not fall out and would not even be accessible without removing a "chute". Indeed, some coins would simply stick within the interior of the meter. It was established by direct and cross-examination of the defendant's witnesses that on June 4, 1973 the Albany Police Department caused all of the meters on State Street that had been previously collected by defendant in August and October, 1972 to be thoroughly emptied. As a result of that collection it was found that after a "normal" collection, there remained some 100 dimes in the meters. The defendant further established that on May 29, 1973 a Patrolman Loomis had by special procedures removed an unusual amount of dimes from the meters on State Street. It is purely speculative whether any of the May 29 dimes were the missing marked ones and the record is entirely silent as to the possibility of some other collector having removed the marked dimes on dates other than August 21 and October 16, 1972. While the bulge in the trouser pocket of the defendant certainly indicates that he was placing something therein, and most likely dimes, there is a failure of proof that any dimes were missing and there is no reason to believe that the "noticeable" bulge did not have an explanation consistent with innocence. The defendant testified that the bulge in his left trouser pocket was due to his carrying a wrench used in opening some of the meters. There was ample reason for the investigators to believe that a theft had occurred; however, the record establishes that the only reasonable conclusion is that the defendant did not bring the missing dimes to the bank and that he *might* have taken them. Such evidence does not establish that the dimes were stolen or that any dimes were stolen. Judgment reversed, on the law and the facts, and indictment dismissed. Greenblott, J. P., Sweeney and Herlihy, JJ., concur; Kane and Larkin, JJ., dissent and vote to affirm in the following memorandum by Kane, J. The defendant sought to refute the direct account of the investigators by testifying that he often took a wrench from his pocket and banged it on stubborn or faulty meters as a device to assist in unlocking them. However, one of the investigators recounted that after the defendant placed his closed fist into his pocket, shortly before reaching the next meter on his rounds, he generally withdrew his hand in an open position. Neither investigator mentioned the display or use of any wrench as they observed the defendant's collection procedures. The defendant thus presented an innocent explanation for the bulge and his actions contradicting the People's direct proof and the jury was free to accept or reject either version. Its verdict resolved a simple factual conflict and this

same exculpatory possibility cannot be resurrected on appeal to defeat a circumstantial feature of the case. Following ostensibly normal collections, the location of 77% of the previously marked dimes was unknown on one occasion and 29% of the similarly marked dimes were unaccounted for on another date. In order to combat the obvious inference that he had wrong-·fully appropriated such coins and to raise a contrary inference that some of the marked dimes had remained in some of the meters for subsequent recovery, the defendant elicited the results of an examination of the machines purportedly showing that some dimes would be discovered in them even after normal emptying. The inspection relied upon by defendant was conducted by fellow Albany police officers over six months after the last incident recited in the indictment and a month after his arraignment on the instant charges. Two officers collected from the machines and were closely followed by a third whose job it was to extract whatever dimes his colleagues might have overlooked. The facts of this case were such that only two possibilities existed; either the missing marked dimes had been taken by the defendant or they had remained in the meters. Once again the jury was faced with opposing proofs, but this time each was circumstantial in nature. The verdict reflects acceptance of the People's inference and a rejection of the only other conceivable theory as put forth by the defendant. Since 25 meters were ·"salted" by the investigators, whereas the Albany police recovered overlooked dimes from the unspecified number of machines on defendant's entire route, it is plain that the factual underpinnings favoring the adoption of one inference in preference to the other differed. In any event, remarkable percentages of marked dimes went undeposited by the defendant and we cannot say that the conclusion of the jury was unwarranted or based on a probability of low degree. Lastly, we are inclined to agree that certain Albany police reports were inadmissible as business records under CPLR 4518 for they were far from being routine (see 33 Albany L Rev 251), but, since their contents were apparently developed independently by the defendant himself, any conceivable error in this regard became academic. The judgment should be affirmed.